

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

F.#2007R01328

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 2, 2009

**VIA ECF**
The Honorable Frederic Block
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re: United States v. Ralph Cioffi and Matthew Tannin
       Criminal Docket No. 08-415 (FB)

Dear Judge Block:

   The government respectfully submits this letter in reply to Defendant Tannin's September 29, 2009 Memorandum Of Law ("Tannin's Memorandum" or "Br").  Given the disclosure in Tannin's Memorandum that Tannin deleted his G-Mail account (the "Account") on the advice of counsel, a <u>Curcio</u> hearing is necessary to determine whether a conflict exists; whether the conflict is waivable; and whether Tannin will knowingly and voluntarily waive the conflict.[1]  To be clear, the law of this circuit requires a prompt <u>Curcio</u> inquiry and waiver procedure when, as is the case here, a potential conflict of interest has been discovered.[2]

---

   [1] In cases where, as here, more than one potential conflict has been raised, "each cannot be considered in isolation, but rather must be considered together when assessing whether there is a congruence of interests between the lawyer and his client."  <u>United States v. Rahman</u>, 861 F. Supp. 266, 274 (S.D.N.Y. 1994); <u>see also</u> <u>United States v. Levy</u>, 25 F.3d 146 (2d Cir. 1994).

   [2] In Section III below, the government addresses in detail Tannin's arguments that the government engaged in "dilatory" tactics.  In short, contrary to Tannin's claims, the government has a strong interest in seeing this trial move forward on schedule.  This issue is before the Court on the eve of trial because of Tannin's deliberate efforts to avoid the

I.    Potential for Conflict Arising From
      Tannin's Deletion of the Account

      A.    Chronology of Events

            On Wednesday evening, Tannin's  counsel revealed
for the first time that Tannin deleted the Account on the
advice of counsel.[3]  (Br.  3, 11-13).  The Account was
deleted on March 11, 2008, after:

      Tannin had received a document preservation memorandum
      from Bear Stearns[4] on June 19, 2007;

      Tannin had told counsel for Bear Stearns on September
      12, 2007, that he had no relevant documents outside of
      his office, including personal emails;

      Tannin had received a written request from the United
      States Securities and Exchange Commission ("SEC") that
      Tannin preserve all electronic documents related to
      Bear Stearns and the Funds on November 14, 2007; and

      Tannin had received a formal subpoena from the SEC,
      issued on December 12, 2007, calling for all
      "electronic mail . . . and storage devices" related to
      Bear Stearns and the Funds.

            For several months after November 20, 2007,
counsel for Tannin was actively engaged in negotiations with
both the SEC and this Office about the preservation and
production of personal e-mails such as those held in the
Account.  Counsel for Tannin and the SEC discussed specific
protocols required by the SEC for the preservation of the

_____

matter until this week.  The government has raised this issue
because, as noted previously, caselaw dictates that any possible
conflict of interest issue must be resolved promptly upon
discovery.

      [3]    Tannin's Memorandum speaks only in terms of "closing"
the Account.  The government uses the term "deleted" as that is
word Google Inc. used when it described what happened to the
Account on March 11, 2008.

      [4]    Bear Stearns, itself, was responding to a request to
preserve documents from the SEC.

2

Account and the need for an affidavit to confirm that those protocols were followed.  Notwithstanding repeated promises for such an affidavit, it was never provided.

Tannin's attorneys were also engaged in active negotiations with this Office in the days surrounding counsel's advice to delete the Account.  On February 29, 2008 – eleven days before – and March 14, 2008 – three days after the Account was deleted – counsel for Tannin met with this Office as part of its attempt to avoid Tannin's prosecution.  These conversations focused on the significance of an April 22, 2007 e-mail ("the G-mail") Tannin sent from the Account.

We now know that despite the outstanding document preservation requests, the subpoena and the SEC's insistence on specific protocols for the preservation of data, counsel for Tannin advised Tannin to delete the Account.

B.    Applicable Law

When a court receives notice that an attorney in a case pending before it might have a conflict of interest, it must determine whether the attorney in fact suffers from the alleged conflict.  Levy, 25 F.3d at 153.

As the government indicated in its last submission regarding Curcio, to determine whether a conflict exists, the Court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all.  Id.; United States v. Locascio, 6 F.3d 924, 931 (2d Cir. 1993).  If, after inquiry, the Court determines that potential conflicts exist and that the conflicts are such that a rational defendant could knowingly and intelligently choose to continue to be represented by the conflicted attorney, the Court should obtain, directly from the defendant, a valid waiver in accordance with the procedures set forth in Curcio.  See, e.g., United States v. Malpiedi, 62 F.3d 465, 470 (2d Cir. 1995); Levy, 25 F.3d at 153.  As part of those procedures, the Court must:

> (I) advise the defendant of the dangers
> arising from the particular conflict;
> (ii) determine through questions that
> are likely to be answered in narrative

3

form whether the defendant understands
those risks and freely chooses to run
them; and (iii) give the defendant time
to digest and contemplate the risks
after encouraging him or her to seek
advice from independent counsel.

United States v. Iorizzo, 786 F.2d 52, 59 (2d Cir. 1986);
see also United States v. Curcio, 680 F.2d 881, 888-90 (2d
Cir. 1982).

Given the importance of Tannin's decision, the
government respectfully requests that the Court conduct an
inquiry of Tannin in a manner consistent with the first set
of questions set forth in Attachment A.  After such an
inquiry, Tannin should be permitted an opportunity to
consult with independent Curcio counsel to discuss the
potential conflicts of interest in a confidential setting.
Thereafter, and the government suggests that the Court allow
Tannin a few days to consult with independent counsel, the
Court should then proceed with the second set of questions
in Attachment A relating to his waiver of any and all
potential conflicts of interest.  Id. (discouraging "on the
spot" decisions without the benefit of the "advice of
independent counsel").  If Tannin's responses are
satisfactory to the Court and reflect that Tannin
comprehends the conflicts of interest and nonetheless
desires to waive the conflicts, the trial may proceed as
scheduled.

It is worth noting, however, that some conflicts
"are so severe that they are deemed per se violations of the
Sixth Amendment [and] are unwaivable . . .." United States
v. Williams, 372 F.3d 96, 102 (2d Cir. 2004). Per se
conflicts of interest occur "only where . . . where trial
counsel is implicated in 'the same or closely related
criminal conduct' for which the defendant is on trial." Id.
at 103 (quoting United States v. Fulton, 5 F.3d 605, 611 (2d
Cir. 1993)).  The Fulton court held conflicts that arise in
those circumstances cannot be waived because trial counsel's
own "personal reputation and more than that, the potential
that he himself might be accused of a crime . . . would
affect virtually every aspect of [counsel's] representation
of the defendant." Id. at 607, 612-13.

Notwithstanding a defendant's willingness to waive
his attorney's conflict of interest, courts retain

4

"substantial latitude" in refusing such waivers.  <u>See</u> <u>United States v. Wheat</u>, 486 U.S. 153, 163 (1988).  This is so because "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." <u>Id</u>. at 160; <u>see</u> <u>also</u> <u>United States v. Jones</u>, 381 F.3d 114, 119 (2d Cir. 2004)("[D]isqualification . . . implicates not only the accused's right to counsel, but also the interests of the judiciary in preserving the integrity of its processes, and the government's interest in a fair trial and a just verdict.").

Tannin's Memorandum suggests that there was a reasonable and lawful explanation for counsel's advice to delete the Account and the subsequent deletion thereof.  In order to understand if there is a potential conflict in this case, the Court must determine that counsel's advice to delete the Account would not create concerns that may potentially make their interests adverse to those of their client.[5]  If the Court determines that counsel will not be so preoccupied, any conflict would likely be waivable.  <u>See</u> <u>Williams</u>, 372 F. 3d at 105 (observing that it is "unresolved in this Circuit whether the *per se* conflict rules are applicable where the defendants is aware of the facts underlying what would otherwise be a *per se* conflict.")

II.  Potential Conflict Relating to
     <u>The Production Of The G-Mail</u>

Tannin's attorneys have signaled that they intend to argue that Tannin produced the G-Mail voluntarily.  To rebut this argument, the government intends to call Ms. Redlich, the attorney for Raymond McGarrigal (another portfolio manager), to testify about the sequence of events leading up to the production of the G-Mail.  Ms. Redlich's testimony will demonstrate that Tannin's production of the G-Mail was not wholly "voluntary," but rather a response to notice that McGarrigal was going to produce it anyway.  Tannin may then wish to call one of his attorneys to refute Ms. Redlich's account of the production of the G-Mail.

---

[5]   Given the significance of this issue, it may be prudent to conduct this inquiry <u>in camera</u> and on the record.  The Court may consider whether to inquire into counsels' proffered legal basis for their advice.

The timeline is as follows:

- On or about October 15, 2007, the SEC requested personal e-mails for Tannin, Cioffi and McGarrigal from Bear Stearns, and the request was passed on to their respective attorneys;

- On or about October 29, 2007, McGarrigal provided Ms. Redlich with the G-Mail;[6]

- On November 6, 2007, Ms. Redlich spoke with Ms. Beattie on the telephone and indicated her intention to produce the G-Mail to Bear Stearns attorneys;

- Later on November 6, 2007, Ms. Redlich had a second telephone call with Ms. Beattie;

- On November 7, 2007, Ms. Redlich and Ms. Beattie, together, produced the G-Mail to Bear Stearns counsel.

This timeline, the government will argue, refutes Tannin's expected claim that he provided the G-Mail voluntarily.  Rather, Tannin came forward with the G-Mail only after he was informed that McGarrigal was going to produce it anyway.  Tannin may wish to dispute these facts and the related argument with the testimony of Ms. Beattie.

A.   Ms. Redlich's Testimony Is Both Relevant And Not Privileged

Tannin's Memorandum argues that this evidence is irrelevant and privileged.  He is wrong.  If Tannin intends to argue that his production of the G-Mail was "voluntary" and thus mitigates its evidentiary value, then the government must have the opportunity to rebut this argument. Simply put, if the defendant wishes to put this issue before the jury, the voluntariness of his production becomes highly relevant.  To date, Tannin has never disabused the

---

[6]   In its September 25, 2009 submission, the government indicated that McGarrigal gave Ms. Redlich the G-Mail on November 6, 2007.  Counsel for Ms. Redlich has since informed the government that this date was misunderstood:  McGarrigal turned it over on October 29, 2007.

government or the Court of his intention to make this argument.  Accordingly, the government is entitled to rebut Tannin's argument.  The government intends to rebut Tannin's assertion that he acted voluntarily with the facts of the timeline.

If called to testify, Ms. Redlich would simply testify to the facts of the timeline: (1) that McGarrigal gave his version of the G-mail to Ms. Redlich on or about October 29, 2007; (2) that Ms. Redlich decided to turn it over to counsel for Bear Stearns; (3) that Ms. Redlich contacted Tannin's counsel, on November 6, 2009, before turning the G-mail over to Bear Stearns counsel; and (4) that, after being notified of McGarrigal's intention to produce the G-mail, Tannin joined in the production, which occurred on November 7, 2007.

The facts of the timeline do not implicate any privilege protections – attorney client or work product – whether held jointly or individually.  This is so because the proffered testimony does not contain any statements or confidential legal advice whatsoever.  It simply sets forth dates of events as would be set forth in a privilege log of facts withheld on the basis of privilege.  See e.g., Aristocrat Leisure Ltd. v. Duetsche Bank Trust Co. Americas, 2009 WL 3111766 (S.D.N.Y. 2009) (holding that "the fact that counsel was consulted on the subject matter underlying [] litigation in and of itself is not privileged and citing to Fed. R. Civ. Proc. 26(b)(5)(A)(ii)(describing the substance of a privilege log including description of the nature of the documents, communications, or tangible things not produced or disclosed in a manner that will enable other parties to assess the claim.")).

B.   Potential Remedy

It would appear, based on Tannin's Memorandum, that the parties can reach a mutually agreeable stipulation related to the facts surrounding the production of the G-Mail.  Tannin suggests that the timeline can be "readily established without Ms. Redlich or Ms. Beattie testifying." Br. at 10-11.  This is true.  Tannin also suggests that the Court has broad discretion to adopt a remedy other than disqualification.  Br. at 6.  Accordingly, if the defendants would stipulate to the facts of the timeline, there is no need for the government to call Ms. Redlich and, presumably, no need for the defendant to call Ms. Beattie.

C.   <u>Waiver</u>

        If Tannin agrees to enter into the proposed
stipulation, the Court should still inquire, pursuant to
<u>Curcio</u>, to determine that Mr. Tannin understands the
potential conflict of interest and that he was not unfairly
influenced by his desire to keep Brune & Richard as counsel
in electing to agree to the stipulation.

III. <u>Timing</u>

        Given the import of these issues and the reality
that Tannin should be afforded the opportunity to seek
independent counsel, the government urges the Court to
address these issues as soon as possible.

        Tannin's accusation that the government engaged in
"dilatory" tactics by not bringing their potential conflicts
to the Court's attention earlier is wrong.  As set forth
above, the government has been attempting to obtain the
contents of the Account for over a year.  Apart from this
Office's and the SEC's attempts to obtain the Account in the
course of the parallel investigations, additional attempts
have been made to obtain the contents of the Account since
the grand jury returned the indictment.  On January 8, 2009,
the SEC demanded production of Tannin's subpoenaed computers
and electronic data in the context of the civil suit.  On
January 21, 2009, Tannin admitted that he never completed
his production of materials responsive to the SEC subpoena,
and declined to do so, asserting, for the first time, his
Fifth Amendment right against self-incrimination.  Tannin
failed to mention that he had deleted the Account on advice
of counsel at that time.

        In the following months, the SEC and this Office
continued to press Tannin to turn over the imaged electronic
documents in their custody.  (<u>See</u> Government's March 16,
2009 Motion For Reciprocal Discovery, ECF #69; Government's
April 20, 2009 Reply, ECF #90).  There was still no mention
that Tannin had deleted the Account on advice of counsel.

        Thereafter, the SEC moved to compel Tannin to
produce the previously subpoenaed electronic materials.
Addressing the validity of Tannin's act-of-production
privilege before U.S. Magistrate Judge Viktor V. Pohorelsky,
Tannin's counsel stated:

Just briefly, Your Honor.  I think [the SEC] is a little confused about the circumstances of the production of this famous gmail but it doesn't really matter for the argument.  [The SEC's] point is[,] I think[,] that nothing about producing it is incriminating but that's exactly what <u>Hubble</u> addressed and <u>Hubble</u> says there is an act of production privilege, the same thing as the case of <u>In re: Three Grand Jury Subpoenas</u>.  We're not -- it's not close.  I don't know how to say it any other way.  The act of production privilege is well established and this is heartland information.  <u>They don't have it, they want it, and if it exists and we were to give it to [the SEC] then we would be conceding possession, existence and authenticity</u>.  We've been careful not to concede none of those things all along and -- so we're right in the heartland of <u>Hubble</u>.

(Transcript of June 5, 2009 Hearing in <u>SEC v. Cioffi, et al.</u>, pp 8-9) (emphasis supplied).  Counsel did not advise the Court that the Account had been deleted.

In July 2009, Magistrate Judge Pohorelsky recommended the SEC matter be stayed, thereby ending the SEC's ability to seek the contents of the Account.  The Court subsequently denied Tannin's motion to lift the stay.  Thereafter, the government obtained a search warrant for the Account at Google, Inc., the third-party service provider that held the Account.  By letter, dated July 17, 2009, the government was advised that "user deleted [A]ccount" on March 11, 2008.

Since discovering that Tannin deleted the Account, the government has attempted on several occasions to ascertain from defense counsel whether there is a potential conflict in their present representation of him.  For instance, on August 4, 2009, the government advised Tannin's counsel that it had learned that the Account had been erased.  The government asked what happened to the Account, and counsel stated that it was imaged.  Counsel had not provided any definitive response to our inquiries until we

learned, for the first time, three days ago, that counsel had advised Tannin to delete the Account.

Respectfully submitted,

BENTON J. CAMPBELL
UNITED STATES ATTORNEY

By: _____/s/_____
James G. McGovern
Ilene Jaroslaw
Patrick Sean Sinclair
Brian Sano
Assistant U.S. Attorneys